COMMONWEALTH OF MASACHUSETTS

SUPERIOR COURT DEPARTMENT

PLYMOUTH SUPERIOR COURT

**PLYMOUTH, ss**                                          **Docket No:**

---

STEPHEN J. WALSH

                PLAINTIFF

V.

 CALIBER HOME LOANS US BANK TRUST NATIONAL ASSOCIATION, FAY

SERVICING LLC

                DEFENDANTS

---

PLAINTIFF'S MOTION TOP A PRELIMINARY INJUNCTION TEMPORARY RESTRAINING ORDER

Now comes the Plaintiff Stephen Walsh and respectfully moves this honorable court under MGL Ch 214

sections 1,2 and 5 and other laws to issue a Preliminary injunction/temporary restraining order to (1)

Prevent the foreclosure of his property located at 116 Outlook Dr., Marshfield, Ma 02050 presently

scheduled for January 20, 2022. (2) Prevent any entity to produce the original note properly assigned, to

EXHIBIT

A

justify collection rights and foreclosure rights. (3) Declare that Defendant's actions constitute a breach

of good faith and fair dealing.  And Defendants must assist in resolving mortgage difficulties.  (4) Order

the Defendants not to interfere with Plaintiff's and family's use and enjoyment and occupancy of the

property located at 116 Outlook Rd., Marshfield, MA 02050. (5) Declare that the mortgage was

structurally unfair and was based upon fraud from the beginning.  (6) Any and other such relief.

The Mortgagee sold to the Plaintiff a mortgage that was "doomed to fail" from the beginning.  It was

based upon stated and inflated income.  It was sold in violation of state and federal laws, including 940

CMR 8.05 and 8.06 and the Fremont decision and laws regarding mortgages being in the interest of the

homeowner to purchased.

The mortgages in a decade has DONE NOTHING TO CORRECT THE PROBLEMS AND MORTGAGE. The

Plaintiff has approached the mortgage company on many occasions to resolve the issues.  They have

never been modified as is required with an unconscionable mortgage such as this.  They have given the

Plaintiff a bad faith run-around and 10 years of misleading assurances and delays,

  1.   Standard for Preliminary Injunctive Relief:

Packaging Industry Group, Inc. v. Cheney, 380 Mass. 609 (1980)

"[W]hen asked to grant a preliminary injunction, the judge initially evaluates in combination the moving

party's claim of injury and chance of success on the merits. If the judge is convinced that failure to issue

the injunction would subject the moving party to a substantial risk of irreparable harm, … the judge

must then balance this risk against any similar risk of irreparable harm which granting the injunction

would create for the opposing party. What matters as to each party is not the raw amount of irreparable

harm the party might conceivably suffer, but rather the risk of such harm in light of the party's chance of

success on the merits. Only where the balance between these risks cuts in favor of the moving party

may a preliminary injunction properly issue. (380 Mass at 617.)

The legal standard as descried above shows that the Plaintiff is certain to win. The Defendants not only violated state and federal laws and case law, they also promulgated a scheme to sell a mortgage to the client to make a quick financial gain with no regard for the well-being of the Plaintiff.

The Balancing of the harms favor the Plaintiff. The Plaintiff will lose his home and residence.  The public policy interest of not allowing unscrupulous dealings to unsuspecting homeowners is paramount.  The mortgage company only stands to lose time and possible money.

Therefore, the Plaintiff respectfully requests that this Honorable Court issue an order specifying:

1)Prevent the foreclosure of his property located at 116 Outlook Dr., Marshfield, Ma 02050 presently scheduled for January 20, 2022. (2) Prevent any entity to produce the original note properly assigned, to justify collection rights and foreclosure rights. (3) Declare that Defendant's actions constitute a breach of good faith and fair dealing.  And Defendants must assist in resolving mortgage difficulties.  (4) Order the Defendants not to interfere with Plaintiff's and family's use and enjoyment and occupancy of the property located at 116 Outlook Rd., Marshfield, MA 02050. (5) Declare that the mortgage was structurally unfair and was based upon fraud from the beginning.  (6) Any and other such relief.

DATE: January 18, 2022

For the Plaintiff, Stephen J. Walsh

By and through his attorney

Robert K. Cabana  BBO 641885

1354 Hancock St., Suite 206

Quincy, MA 20169

617-405-4283

Rkc6068@aol.com

COMMONWEALTH OF MASACHUSETTS
SUPERIOR COURT DEPARTMENT
PLYMOUTH SUPERIOR COURT

*PLYMOUTH, ss*                                    *Docket No:*

_____

STEPHEN J. WALSH
          PLAINTIFF

V.

CALIBER HOME LOANS US BANK TRUST NATIONAL ASSOCIATION, FAY

SERVICING LLC

          DEFENDANTS

_____

COMPLAINT

AGAINST:

INTRODUCTION

WILMINGTON FINANCE, CALIBER HOME LOANSUS BANK TRUST

NATIONAL ASSOCIATION, FAY SERVICING LLC

OF THE MORTGAGE AS THE BROKER LIED ABOUT INCOME TO ALLOW HIM

TO QUALIFY FOR THE ADJUSTABLE-RATE MORTGAGE AND INTEREST

ONLY. THE PURPOSE OF THE DECEIPT WAS TO ALLOW THE BROKER AND

OTHERS TO PROFIT OFF OF STRUCTURALLY UNFAIR MORTGAGES.

THE MORTGAGE WAS STATED INCOME, IN VIOLATION OF STATE LAW. .
THE BROKER FAILED TO PROVIDE PLAINTIFF WITH INFORMATION WHICH
WOULD HAVE EXCLUDED HIM FROM MAKING MORTGAGE IN THE FIRST
PLACE. VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION
ACT. IN THE ORIGINATION FOR SELLING A LOAN WHICH THE ENTITY
MAKING THE LOAN KNEW OR SHOULD HAVE KNOWN THAT THE PLAINTIFF
COULD NOT AFFORD. THE LOAN WAS PRESUMPTIVELY AND
STRUCTURALLY UNFAIR. FRAUD IN THE ORIGINATION FOR BASING
MORTGAGE APPROVAL ON EXCESSIVE INCOME. UNFAIR AND DECEPTIVE
ACTS BY LURING PLAINTIFF INTO ACCEPTING THE MORTGAGE WITH THE
ASSURANCE HE COULD REFINANCE WITHIN A SHORT PERIOD OF TIME.
POSSIBLE FALSIFICIATION INCOME TO RAISE PLAINTIFF'S
QUALIFICATIONS THAT BROKER SHOULD HAVE KNOWN WOULD QUALIFY
PLAINTIFF FOR LOAN HE COULD NOT REPAY. VIOLATIONS OF
MASSACHUSETTS PREDATORY LENDING HOME LOANS PRACTICES ACT.
UNCONSCIONABLE CHARGES FOR SETTLEMENT CHARGES, YIELD SPREAD
PREMIUMS AND VIOLATION OF FIDUCIARY DUTIES. VIOLATIONS OF
FEDERAL AND STATE LAWS BY CHARGING EXCESSIVE PREMIUMS FOR
INSURANCE. FAILURE TO FOLLOW FEDERALAND STATE LAWS WHEN
ASSIGNING MORTGAGETHE FAILURE OF ANY ENTITY TO ENFORCE
THE OBLIGATIONS OF THE MORTGAGE TO PRODUCE A VALID NOTE
PROPERLY ASSIGNED TO JUSTIFY COLLECTION RIGHTS OR ANY RIGHTS.
FOR MANY REASONS THE ABOVE MENTIONED

MORTGAGE COMPANIES VIOLATED THEIR DUTIES UNDER THE FEDERAL
MAKING HOME AFFORDABLE PROGRAM (HAMP) TO LIVE UP TO THE
CONTRACT OBLIGATIONS TOWARDS THE PLAINTIFF AS A THIRD PARTY
INTENDED BENEFICIARY UNDER PARKER V. BANK OF AMERICA
. MOST IMPORTANTLY, DEFENDANTS COMMITTED UNFAIR AND
DECPETIVE ACTS BY INSTITUTING AN INTEREST ONLY MORTGAGE AND
ADJUSTABLE-RATE MORTGAGE   THE MORTGAGE NOTE TO RECEIVE ANY
MORTGAGE PAYMENTS, SERVICE MORTGAGE AS THEY NEVER HAD
PROPER ASSIGNMENT OFMORTGAGE; LACKED LEGAL STANDING TO
CARRY OUT  FORECLOSURE ACTION AS THEY WERE NOT PROPERLY
ASSIGNED THE MORTGAGE THEY CANNOT PRODUCE THE ORIGINAL NOTE
TO JUSTFY COLLECTION AND FORECLOSURE RIGHTS;   ALSO, FOR UNFAIR
AND DECEPTIVE PRACTICES AND FOR VIOLATION OF STATE AND FEDERAL
LAWS FOR FRAUDULENT ORIGINATION OF THE MORTGAGE BY FALSIYING
FINANCIAL INFORMATION AND BY GIVING THE PLAINTIFF A MORTGAGE
THEY KNEW OR HAD REASON TO KNOW HE COULD NOT AFFORD BY
OFFERING THE PLAINTIFF, A MODIFICATION WITH TERMS WHICH WERE
UNREASONABLE AND LEFT THE PLAINTIFF WORSE OFF THAN BEFORE.
ALSO, THE DEFENDANTS DID NOT MARKET THE PROPERTY OR IN ANY
WAY ATTEMPT TO PROTECT THE EQUITY OR AS A TRUSTEE FOR THE
BENEFIT OF THE HOMEOWNER. ALSO, FOR BAIT AND SWITCH. PLAINTIFF
WAS ORIGINALLY PROMISED A FIXED RATE MORTGAGE.  HE WAS SOLD
THE ADJUSTABLE RATE SECOND MORTGAGE ON A TAKE IT OR LEAVE IT

BASIS. THE MORTGAGE WAS PRESUMPTIVELY AND STRUCTURALLY
UNFAIR UNDER MASSACHUSETTS LAW. FAILURE UNDER MASACHUSETTS
LAW TO DISCLOSE TO A BUY FACTS THAT WHICH MAY HAVE INFLUENCED
THE BUYER NOT TO ENTER INTO THE TRANSACTION. FALSIFICATION OF
INCOME INFORMATION ON THE APPLICATION.

VIOLATIONS OF MASSACUSETTS GENERAL LAWS CHAPTER 234, SECTIONS
35A, 35B, AND 35C. THE PRESENT MORTGASGERE DID NOT PRODICE AN
AFFIDAVIT. THE AFFIDAVIT PRODUCED IS NOT BASED ON PERSONAL
KNOWLEDGE OF THE AFFFIANT

. NO FORECLOSURE CAN TAKE PLACE. THE PLAINTIFF WAS NOT
PROPERLY NOTICED AS TO HIS 150 DAY RIGHT TO CURE. , EVEN MORE
IMPORTANT THE MORTGAGE COMPANIES NEVER RESPONDED WITH A NET
PRESENT VALUE ANALYSIS OF THE MORTGAGE LOAN, A STATEMENT OF
INTEREST OF THE CREDITOR OR A MODIFIED MORTGAGE OR A
STATEMENT THAT NONE WOULD BE OFFERED.

PARTIES

1. Stephen J. Walsh, The Plaintiff lives at 116 Outlook Road, Marshfield, MA 02050

2. U.S. Bank Trust NA 100 Wall St FL 16 New York, NY, 10005-3716 United States

3. Caliber Home Loans 1525 South Belt Line Road, Coppell, Texas, 75019

4. Fay Servicing LLC., 80001 Woodland Center Blvd., Suite 100, Tampa, Florida, 33614.

FACTUAL BACKGROUND

5. Stephen J. Walsh brings this suit, as a Massachusetts plaintiff, to challenge the

failure of Defendants to honor its agreements with the borrower to modify the

mortgage under and prevent the foreclosure on his property 116 Outlook Drive.,

Marshfield, MA 02050 scheduled for January 6, 2022.

His first mortgage was a stated income mortgage where the income was purportedly

falsified.  As such the Plaintiff is entitled to rescission of said mortgage and the return of

all payments. Furthermore; the mortgage was A "STRUCTURALLY UNFAIR"

mortgage under Massachusetts law being both an extreme adjustable-rate mortgage, as

well as an interest mortgage in violation of the test established to determine ability to pay.

6. The Plaintiff was sold an adjustable-rate mortgage and an interest only mortgage. The

mortgage by slick marketing techniques.  It was also a stated income loan. The loan was

presumptively unfair in that it was fixed for 2 years.  It had a "teaser" rate that was more

than 3% lower than the fully indexed rate. Measured by the debt-to-income ratio under

the fully indexed rate, said rate exceeds 50%.  The loan also carried a substantial

prepayment penalty.

7. The Plaintiff applied through CTX Mortgage and Kevin McCarthy in 2006.  He was

promised a better mortgage and money back as part of a "jumbo loan". He was promised

that he could refinance with a year.

8. At the closing the adjustable rate was hidden in the back of the documents.  The

monthly payment turned out to be $400 more than portrayed at the closing.

9. He was given an adjustable-rate mortgage, and interest only mortgage where the

payments could increase by hundreds of dollars per 6 months.  The interest only period

would be for 5 years.  The fixed or teaser period for the fixed period would be 2 years.

This was a 2/28 mortgage where the interest rate after the first two years could go up

every 6 months and considerably to a maximum more than twice the amount. The initial interest rate was a high 8.8%. After 2 years the interest rate could increase rapidly until it reached a maximum of 14.8%.

10. After years of desperation the Plaintiff applied for modification and was fumbled around multiple times. Sometimes they would ignore his application. Sometimes he would not even have his phone calls returned. Every time he tried he was thwarted and not allowed even to complete the process!

11.. Some of the Plaintiff's other claims are also simple- when financial institution accepts an application to modify a loan to prevent a foreclosure, under the Making Home Affordable Program (HAMP), the lender must treat the application in a non-negligent manner. Foreclosure activity must stop and the lender must follow through and meet the strict deadlines to make a determination. Inertia is not an option. Defendants have violated the Plaintiff's rights as a third-party beneficiary under the federal contract between the government and Defendants under the HAMP, as the institution is acting under the purported aegis of a federal program that is specifically targeted at preventing foreclosures. This is both a basic rule of contract law and morality. This program ended at the end of 2016.

12. Under Commonwealth v. Fremont Inv. & Loan and Fremont Gen, Corp., No. 07-4373-BLS1 (Mass. Sup.Ct. Feb. 25, 2008) and Massachusetts General Laws Chapter 93-A sect. 13. The Defendants hung an original mortgage and subsequently serviced a loan which was presumptively unfair in the fact that it was a 2/28 adjustable-rate loan (as well as an interest only loan). This loan had an original "teaser rate" more than7% lower than the fully indexed rate. The borrower had a debt-to-loan ratio in 2006 of well

over 50%, especially when the fully indexed rate is considered. There was a substantial

pre-pay penalty. None of this was made clear to the Plaintiff when he took out the loan.

The Plaintiff was not told that the mortgage could adjust within a year. He was sold this

toxic mortgage by slick marketing and promises of quick refinances.

13. As a participating server in HAMP, the Defendants have entered into written

agreements for modifications. The Plaintiff, for his part, multiple times has

applied for modification over the years. The defendants have ignored their contractual

obligations to modify the loan permanently or at least temporarily modify.

14. As a result, the Plaintiff has been deprived of the opportunity to keep his homes and

cure any delinquencies. The actions and lack of action of the Defendants thwart the

purposes of the HAMP program and are illegal under Massachusetts law.

15. Under Massachusetts Uniform Commercial Code section 2-301, unless the claim can

produce the original note, properly assigned, he (or the claimant) has no collection rights

and cannot foreclose. As of this date neither Caliber Home Loans- nor anybody else has

produced the document or filed the appropriate affidavit with the registry of deeds as

Required by Massachusetts General Laws Chapter 244.

16. The Plaintiff was misled at every stage of the process, through slick marketing

techniques and fast procedures that really did not afford him the opportunity to question.

17. The foreclosure crisis in this state and nation is far from over. Massachusetts state

legislative efforts were able to slow the rate. But, the number of new filings for

foreclosure have once again rose.. This is primarily due to mortgage companies wanting

to clear away back mortgages.

18. Congress had passed the Emergency Economic Stabilization Act of 2008 and then

Amended it with the American Recovery and Reinvestment Act of 2009("Act").

19. The purpose of this Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership" 12 U.S.C.A. sect 5201. The program ended in December 2016.

20. The Plaintiff over and over again provided all of the documentation required to be Considered for modification under said programs. Yet NOT ONCE did any of the mortgage companies follow through in good faith!

21.  As indicated above, the Plaintiff could not afford the original loans. This loan also possessed elements that were presumptively and structurally unfair under Massachusetts law.

22. Yet, an elaborate scheme web was set up to catch the Plaintiff on the mortgage. The mortgage which was structurally unfair under Massachusetts Consumer law was cleverly sold to the Plaintiff on a take it or leave it basis.

Basically, he was sold the idea of taking out the adjustable rate, so he could benefit from the "teaser rate"; and, get some quick case. Along with that he was told that the interest only period would give him a low mortgage payment while he was trying to refinance. He was virtually guaranteed that he could refinance within a few years. This was, in spite of the fact that they could not guarantee that the value of the property would increase enough to justify it.

23. This mortgage was a stated loan, with virtually no income verification. It is pretty clear that false numbers were used.  Furthermore, just by not using the income information provided by the by the Plaintiff, Defendants were in direct violation of state

and federal laws and the mortgages should be nullified on that basis alone.

24. Defendants then quickly tried to close the loans they knew or had reason to know that the Plaintiff would not be able to afford.  Under the Massachusetts Predatory Lending Home Loans Practices Act, by providing high-cost loans without a reasonable belief in the ability to repay The points and fees of this loan should have been amortized over the actual short term to correctly calculate the annual percentage.  This is violation of Massachusetts General Laws Chapter 93A, sect 2.

25. Finally, the terms and rates of the mortgage are so unfair and oppressive and very excessive settlement charges were charged.  The broker was paid the Yield Spread Premium to put the Plaintiff into the more expensive loan

26.  These were was part of a scheme to secure high financial return for the Defendant at the expense of the plaintiff.  The Defendant did not care about the Plaintiff's financial well-being at all    Instead, the Plaintiff was shown contempt by the Defendants, when at every stage of the process he was over charged, denied escrow verification and talked into taking a very bad mortgage, to say the least-, all because the broker saw dollar signs in providing the Plaintiff with this monstrosity of mortgages. This effectively sent the Plaintiff into a several years campaign to attempt to secure stability in a very unstable series of circumstances.  The Plaintiff even had to file Bankruptcy twice.  Clearly, this was not contemplated when he took out the mortgage. Instead, he was misled into thinking he was getting something that he actually was not getting.

27. The Plaintiff was told that he could modify or refinance the loan to help him modify or refinance his mortgage. After considerable

effort on the plaintiff's part and multiple applications under HAMP the Plaintiff was was never modified. Applications were lost. Applications were improperly verified. Phone calls were not returned. Not one mortgage company followed through!

28. This on top of everything else hurts the ability of the plaintiff to cure his problems The client has had a series of problems with these mortgagees, none of which was resolved.

29. Since this mortgage was based upon stated income, it becomes a 'certain mortgage loan requiring special treatment". The only way under M.G.L Ch. 244 Sect 35B that a "good faith effort to avoid foreclosure" can be made is to (1) Determine the homeowner's ability to make affordable monthly payments (2) Identify a modification that achieves borrowers affordable monthly payment. (3) Conduct an analysis comparing the net present value of the modified mortgage and the anticipated recovery that would result from foreclosure. Terms cannot be extended more than 15 years more or for more than a total of 45 years. Clearly, as was required by law, none of this was done by On top of that NO present affidavit has been filed as required by the Chapter 244. The previous one was not based on personal knowledge and thus invalid.

### COUNT ONE (PRIOR PROGRAM HAMP)

Breach of Contract under HAMP (expired program) and Parker V. Bank of AMERICA

30. The Plaintiff restates and re-alleges every allegation above as is set forth here in full.

31. Even though this is a federal program, the Plaintiff has standing to vindicate his rights under state contract law as here.

32. To establish a breach of contract, Plaintiff must allege that there is a valid contract,

that the Defendant breached its duties under its contractual duties, and, that the breach

caused the Plaintiff damages.  Guckenberger v. Boston University, 957 F. supp. 306,

The elements of a valid contract are offer, acceptance, and an exchange of consideration

or a meeting of the minds.  See Vadnais v. NSK Steering Systems, Inc., 675 F. Supp.

$2^d$ 205, 207 (D. Mass. 2009).  This is clearly the case here.  At every stage until the

very end, the Plaintiff was TOLD that he qualified for consideration for a modification

The TPP documents were

valid offers and the reassurances by the mortgage company were also.  The signatures of

the Plaintiff and subsequent monthly payments, is an acceptance."Time is of the Essence"

for the offer according to the documents.  The HAMP guidelines state the agreements

at every stage of the process. Specific guidelines and requirements permeate every stage.

Notification requirements necessitate immediate responses.

33.  There is consideration here.  Consideration is a "bargained for exchange where

there is legal detriment of the promise or corresponding benefit for the promissory"

Durmic, 2010 WL 4825632, at *3.  This detriment goes beyond mere monthly payments.

Plaintiff was required to provide documentation of current income, make legal

representations about personal circumstances and undergo credit counseling.  These are

all are legal detriments that flowed from acceptance of the process..  Wit v. Commercial

Hotel Co., 253, Mass. 564, 572 (1925).

34.  Plaintiff has suffered severe damages.

He was forced to file for modification approximately multiple times and lose and

waste more  than five years of his life.  And, this was the case for his only to be told

that   forms were lost on dozens occasions, not received  or that he conditionally

qualified for modification. He was also ignored even more often!

35. By reneging on it stated commitment and assurances; and, by failing in the final

analysis to follow through on its commitments, the Defendants have breached their

agreement with the federal government and the Plaintiff and both directly and as a

third party beneficiary of the federal agreement are entitled to sue for breach of contract

and fraud and to stop any foreclosure.

40.  Plaintiff stands ready, willing and able to CONTINUE to perform under the

any agreement.

36.  The Plaintiff has suffered real harm by the Defendant's breach.  This is the

Plaintiff's home and his family.  He has struggled for years to keep the home.

He is much worse off than before he tries to resolve his mortgage difficulties.

In Parker v. Bank of America, Middlesex Superior Court Civil Action number 11-1838

(2008). The Court determined that when a homeowner complies with the terms of the

Making home Affordable Program and submits the documents as required, the mortgage

Company is required to give a timely basis feedback and information needed to complete

an application for modification.  "Inertia is not an option". If the mortgage company

loses documents, mishandles documents or does not handle documents properly, that

company can be sued for breach of third-party intended beneficiary contract.   In this

case the violation was so gross as to constitute substantial breach of contract.

## COUNT TWO

### Breach of Implied Covenant of Good Faith and Fair Dealing

37. Plaintiff repeats and re-alleges every allegation above as if set forth herein in

full.

38. Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

39. The purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance Uno Restaurants, Inc. v. Boston Kenmore Realty Corp. 441 Mass. 376 (2004).

40. Defendant has routinely and regularly breached its duty of good faith and fair dealing By:

a. Failing to perform loan servicing functions consistent with its responsibilities to plaintiff.

   b. Failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and attorneys;

   c. Routinely demanding information already in its files.

   d. Making inaccurate calculations and determinations of Plaintiff's eligibility for modification.

   e. Intentionally and negligently failing to follow through on any segment of the process to Plaintiff.

   f. Failing to follow through on written and implied promises

   g. Failing to follow through on contractual obligations and

   h. Failing to give permanent HAMP modifications and other foreclosure alternative to qualified Plaintiffs.

41. As a result Plaintiff has suffered significant damages and will lose his home within days.

42. "Every contract implies good faith and fair dealing between the parties to it. The covenant of good faith and fair dealing requires that neither party shall do anything that will have the affect of destroying the or injuring the right of the other party to the fruits of its contract." T.W. Nickerson Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 569-570. (2010) the Defendant clearly acted with dishonest purpose or conscious wrongdoing necessary for a finding of bad faith and unfair dealing.  If there ever was a case where this rule applies, surely, it is this one.  Also, as in Speakman v. Allmerica Life Ins. 367 F. Supp. 2d 122, 132 (D. Mass. 2005), "(The court in looking at this rule, must consider whether "the challenged conduct conformed to the reasonable understanding of performance obligation as reflected in the overall spirit of the bargain."  To say the least by dishonestly reneging on the contractual obligations in this case, the Defendants clearly did not act reasonably at all.

### VIOLATION OF HIGH TRUSTEESHIP AND GOOD FAITH

43. The sale of the residence, if allowed, would be a violation of the duty of the mortgagee to act in strictest good faith and trusteeship.  Defendants failed to respond to the numerous attempts by the Plaintiffs to resolve mortgage issues and delinquencies and failed to respond to the Plaintiff's requests and acted in bad faith by proceeding forward toward foreclosure and other actions, leaving Plaintiff to his detriment.  Defendants failed to act even in basic good faith and use reasonable diligence to protect the interests of the Plaintiff. After literally dozens attempts to work with many "representatives" of many mortgage companies, Plaintiff was in much worse shape than before he tried.

### Failure of Defendants to Act in Good Faith and Use

Reasonable Diligence to protect the interests of the Plaintiff

44. In Robert H. Strayton v. Champion mortgage, et al, United States Bankruptcy Court,

District of Massachusetts, Adversary Proceeding #06-01394. (2006),

Judge Somma outlines the criteria to determine whether or not the mortgage company

practices good faith and uses reasonable diligence to protect the rights of the

mortgagor while proceeding forward with an auction. "It is well-established that under

Massachusetts law a foreclosing mortgagee must do more than comply with

the procedures prescribed by statute…The foreclosing mortgagee must also act in good

faith and use reasonable in conducting the foreclosure sale.: (See

Memorandum and Order of Judge Robert Somma, Strayton, at page 4) "More

importantly, the diligence not done is persuasive…: no marketing, no appraisal, no

real estate broker contact, no inquiry into the market regarding either value or

prospective buyers, no inspection effort. Moreover if the foreclosure sale is

completed significant value will be lost to the (bankruptcy) estate."(see Memorandum

and Order of Judge Robert Somma, Strayton, at page 4.)

These words also apply to this case. As stated in other parts of this complaint, none of

the above was done here as well. Nevertheless, the foreclosure is about to take place.

45. There is the added factor here that the mortgage company through trustee will try to

repurchase the property auction. According to Snowden v. Chase

Manhatten Mortgage Corporation et al., (17 Mass. L. Reporter 27; 2003 Mass. Super.

LEXIS 398), when the mortgage company also attempts to repurchase the

property at auction; "it will be held to the strictest good faith and utmost diligence for the

protection of the rights of the principal." (Snowden, 17 Mass. L. Reporter

27 (2003) at 29). Since Defendants always try to repurchase said property at auction, it

owed the Plaintiffs more than just the minimal statutory requirements for

compliance, the Defendants owes the Plaintiffs the strictest good faith and trusteeship by

modifying the terms of the oppressive mortgage, based upon

misrepresentations, and any other effort that would have protected the equity.  At the very

least, the facts indicate that the auction should be prevented from

occurring.  In virtually all cases, the foreclosing Trust, on behalf of the mortgagee,

attempts to repurchase at auction.

46.  The Massachusetts Attorney General's Office has investigated many nation-wide

mortgage servicers for their practices.  In spite of these numerous efforts and

 recommendations by the Massachusetts Attorney General's Office, The leading

mortgagees and others routinely fails to give customers information on

the amount and purpose of the discount points and fees imposed on the loans.

 The brokers acting as representative of the mortgage companies at the point of

origination made false statements regarding loan terms and charges, material costs of the

proposed loans, whether the loan included escrow payments and insurance payments and

insurance payments, the willingness of the mortgage company to refinance at a later date,

misleading statements regarding prepayment penalties.  Plaintiff did not get

any sheet before the closing listing what the expenses would be at closing. Stated income

was the basis of both mortgages, a clear violation of state law.

47. Representatives ignored written disclosures required to be made by the Consumer

Credit Cost Disclosure Act, the Truth in Lending Act G.L., 184, chapter

17D and the real estate Settlement Procedures Act, including, but not limited to the Good

Faith Estimate of Closing Costs.  Defendants either misrepresented cost
or disparaged the accuracy.  The Yield Spread Premium paid by the various mortgage
companies to its agents encouraged agents to charge borrowers above the
wholesale par rate what the borrower qualifies for.  Financial incentives such as this
allowed brokers to charge homeowners higher than they could afford.
Defendants by information and belief have utilized these incentives in the past and
probably at the time of origination of this loan.  None of this was explained to the
Plaintiff.  The plaintiff was directed to take loans that were not in his best interests. .
48. There were virtually no standards regulating the broker's behavior.
. None of the deceptive outlined were scrutinized or corrected.  When the Plaintiff
attempted to ask questions he was given a 9 year run around.
49. This combination of fraudulent origination and procurement of loan behavior,
combined with insincere efforts to straighten out the problems
later and of course with the mortgage company's lack of marketing of the property,
causes the Plaintiff to lose his property and residence.
50.  The mortgage is presently in arrears and is about to be foreclosed on July 11, 2016.
Caliber Home loans lack the standing to foreclose and should not be allowed to
to do so.
51. The various actions and inactions and nondisclosures outlined above violate the:

(I.) The federal Truth in Lending Act 15 U.S.C.  1601, et seq., and the
Massachusetts counterpart, The Consumer Credit Disclosure Act, c. 140D.  These
statutes require, among other things,  that the lender provide the borrower about the
actual costs of the loan in a timely fashion.  This did not happen here.

(II)  The federal Real Estate Settlement Procedures. 12 U.S.C.  2601, et seq., and the Massachusetts counterpart. G.L. 184 17D (c) (1).  These statutes require, among other things, that a lender provide advance disclosure about costs of a mortgage loan so that the borrower may compare  available rates and terms from one lender to another to get the most favorable terms.

(III)  M.G.L. c. 183  63, which requires that the lender make clear to the borrower the points it charges to a borrower.  This did not happen here.

(IV) In addition, Defendants have been in violation of Chapter 268 of the acts of 2004 under MGL Ch. 183 Section 28C, the Act Prohibiting Certain practices within the Mortgage Home Lending Market, by selling a mortgage that was clearly not in the Plaintiffs best interests.

(V)  The Attorney General of Massachusetts has just completed an upgrade of rules and regulations concerning mortgage lending practices in Massachusetts.  The Attorney General now insists that all of these origination violations should all along have necessitated voiding these mortgages due to the fraud. See 940 CMR 8.0.  The United States Congress has proposed legislation in, House Bill No. 3913, outlawing Yield Spread Premiums (YSP)

(VI) In the case of Snowden V. Chase Manhatten Mortgage Corporation, et al, (17 Mass. L. Rep. 27; 2003 Mass., Super Lexis 398) the Massachusetts Superior Court went even a little further that requiring normal good faith and reasonable diligence when the mortgage company conducting auction also attempts to purchase the property at same auction.  This is virtually always the case. When these set of facts occur, the Court quoted a series of prior decisions in concluding

that the mortgage company becomes a trustee held to the highest standards of good faith

and utmost diligence for the protection of the mortgagor/homeowner.  One

of those strict standards is clearly protecting the equity or property of the homeowner.

Nothing was done to market the property or very little to assist the Plaintiffs to modify

the oppressive terms or complete a successful forbearance, Defendants clearly fell far

below these standards.  If there ever was a case of individuals being targeted

and tricked and being hung out to dry, this was it.

VII. Based upon a series of class action lawsuits filed by Attorney General of

Massachusetts, some referred to above, a new theory of the relationship between

mortgage companies and their "prey" in this state.  It is clear from the fact patterns here

and elsewhere that "unfair and defective mortgage "were hoisted upon an

unwary homeowner.  As the marketer of these defective products.  And others should be

required to pay the price for their adverse efforts.

However, due to same the same misleading policies being followed in the origination and

servicing of the mortgage and other improper and illegal tactics by this company, this

present case is even more likely to justify a preliminary injunction.

IX. Article 3 of the Uniform Commercial Code Sect 3-301 indicates that clearly Caliber

Home Loans and its assigns lack standing to do anything here. The cannot produce the

original not properly assigned note and cannot claim the status if agent for the note

holder.

X. The Plaintiff is clearly a third-party beneficiaries of the federal HAMP contract

between the abovementioned mortgage companies and the federal government.  To

enforce the contract the Plaintiffs must be and clearly are, "intended beneficiaries"  In

this the performance required of the servicers who entered into the HAMP (SPA) agreement was intended for the direct benefit of borrowers struggling to pay first mortgages on their residences, with the hope of additional but incidental benefits accruing to the economy as a whole. Denying of the third-party beneficiary status to aggrieved by violations of HAMP would mock the very goals of the program that the contract was intended to further. In the plaintiff's affidavit there is alleged a lengthy period of lost and re-submitted paperwork. The mortgage company, after stating that they were "qualified for HAMP" NEVER ACTED IN GOOD FAITH!

Plaintiffs were told time after time that paperwork was incomplete or that deadlines were passed. The Plaintiff applied at multiple times. He responded quickly to every request for re-submission of information or additional information. In every case, he was told that the information had not been received or that deadlines were passed. While this was going on collections calls continues, letters were sent and the mortgage company moved closer and closer to foreclosure. And, almost unbelievably, literally a dozen other attempts were made to procure assistance under HAMP and other programs Everyone was thwarted by inaction, ignoring the Plaintiff or frustrating his contact efforts!

Inertia is not an option. The servicers are given specific time limits to respond. Decisions must be made on a quick and definite basis. Regulations are clear. Specific duties and responsibilities are owed the homeowners by the mortgage companies. The plaintiffs were not treated fairly. Based upon this reasoning, the plaintiffs lay a claim of contract fraud. In this matter plaintiffs relied on statements and claims made by the Defendants that were wrong or that the Defendants had reason to believe were wrong.

The plaintiffs relied on these statements to their detriment.  And, Breach of Contract: (1)  The Defendants by failing to comply with the federal HAMP guidelines breached their contracts with the Plaintiffs for mortgage servicing/and/ or lending, and (b) the Plaintiffs, as demonstrated before, are third-party beneficiaries of the defendant's contract with the federal government under the HAMP program, which contract the Defendants have clearly breached. See Parker v. Bank of America, Civil Action No. 11-2838, Middlesex Superior Court.

## COUNT THREE

Violation of Massachusetts General Laws c. 106 sect 3-301.  A

.52.  Massachusetts General Laws c.106 sect. 3-301 clearly states that in order to enforce the "person" or entity must be in possession of the note. There are only certain limited exceptions to this:.  Neither one can produce the note. Neither one had standing in the matter.

53.  Furthermore; one must be a holder in due course in order to have the right to collect the debt (here a mortgage) Massachusetts General Law Chapter 106 sect 3-302.  Physical possession of the note is required for a party to be a holder in due course.  M.G.L. sc. 106 sect 1-201(20).  Since the mortgage is the document that attaches the debt evidenced by the note to the property.  Therefore both the mortgage and note must be attached at all times.

54.  A mortgage is security for a note or other obligation.  Private Lending and Purchasing, Inc., v. First American Title Insurance Co., 54 Mass App Ct, 532 at 537. (1945). The mortgage (is) but incident to the debt.  Perry v. Oliver 317 Mass. 538 (1945).

55. Therefore, in order for a mortgage to have effect in Massachusetts, the STATED holder of the mortgage must also have the note. M.G.L. c. 106 sect. 1-201 (20), the holder must be in possession of the note.

Bartholick 35 N.Y. 44. (1867). A leading treatise on the matter by Howard Alperin, 14 C Massachusetts Practice: Summary of Basic Law, 15.126 (4th Ed. And supp. 2009-2010). Summarizes it as follows:  Both the obligation and the security interest must be transferred to the same person. A transfer of the mortgage without the debt is a nullity, and,no interest is acquired by it.  The security cannot be separated from the debt and exist independently from it. Of the identity of their lenders. Schwartz at 266.

The Uniform Commercial Code explicitly requires production of the instrument for debt collection if so demanded by the maker to be presented to the maker for any collection on the debt (Uniform Commercial Code Chapter 106 §3-501)4. Also, under the Uniform Commercial Code codified in MGL Chapter 106 §3-401 5 if the instrument does not have the maker's actual signature on it, collection cannot occur against them.

The Plaintiff has invoked those sections of the Uniform Commercial Code.

The attempt to meet the legal obligation as to proof of a still negotiable wet ink note with all of the legally necessary transfers of the ownership interest in the note required when a note is being used against a collateral asset must also have been met.

COUNT FOUR

STRUCTURALLY UNFAIR MORTGAGES

VIOLATIONS OF MASSACHUSETTS GENERAL LAWS

CHAPTER 93-A

56. The mortgage with Caliber Home Loans/U.S. Bank Trust is a structurally unfair mortgage due to the fact that the above-named derelictions were performed on points, More importantly, it was based on stated income documents, is a clear violation of the law. This faulty mortgage also had an unreasonably high interest rate and monthly payment. This mortgage needs to be removed.

57. As indicated above, Massachusetts rulings have "unfair and deceptive" Acts in Violation of Massachusetts consumer protection laws. A mortgage is Presumptively unfair if it: (1) Is an adjustable-rate mortgage with an initial period of 3 years or less. This was clearly the case with the second mortgage given to RBS Citizens in 2007. (2) The teaser rate is at least 3% lower than the fully indexed rate. (3) The borrower debt-to-income ratio exceeds 50% by debt due under the fully indexed rate. (4) The loan to value ratio is 100% or there is a substantial prepayment penalty, or one that extends beyond the introductory period.

The mortgage clearly falls into all of these factors and is an unfair and deceptive act Under Massachusetts Law. It was a stated income mortgage. The broker and mortgage company did not care if the mortgage was affordable. The mortgage was "structurally unfair". It fit into the 4 prongs of Commonwealth v. Fremont Inv. And Loan, No. 074373-BLS-1 (Mass. Superior Ct (2008). Under Massachusetts General Law Ch 93-A, section 2, this is an unfair and deceptive act. This mortgage should be removed from the property.

58. Plaintiff was not experienced in real estate matters when he took out this loan. The loan was sold in a way that the Plaintiff was led to believe that the mortgage would be low cost until he could refinance again. He was

rushed through the process without a lawyer present. No documents

were required for the procurement of the loan.

In spite of the fact that It is clear that Fremont v. Commonwealth and Drakopoulos

v. U.S. Bank National Association, the Court did not wish to limit the concept of

structurally unfair mortgages to the 4 factors delineated

. But, that other mortgages would qualify. Surely the above-named mortgages were only

unfair they were also unconscionable. Interest rate is not the only analysis. This

does not encompass all possible Fremont and Darkopolous issues. Also,

MGL 183 (c) is not all encompassing in its analysis of structurally unfair mortgages

In Drakopoulos v. U.S. Bank National Association, 465 Mass. 775, quoting other cases

like Fremont Home Loans, the Massachusetts court clearly indicates:

"Concluding that the plaintiffs' loan did not qualify as a high   cost home mortgage loan,

the judge allowed the defendants' motion with

respect to the act, a decision that we view as being unwarranted on this

record and that, accordingly, must be reversed. See part 3.b, infra. To

the extent that the bank may thus have liability as an assignee by virtue

of the act, it would extend to "all affirmative claims and defenses with

respect to the loan" that the plaintiffs could assert against the lender,

including the statutory claims asserted under the Consumer Protection

Act, G. L. c. 93A; and the Borrower's Interest Act, G. L. c. 183, § 28C, as

well as the affirmative defense of unconscionability…"

"In Fremont, we held that a lender may be liable under G. L. c. 93A for

"the origination of a home mortgage loan that the lender should

recognize at the outset that the borrower is not likely to be able to repay." Id. at 748-749. In that case, the judge determined that the mortgage loans offered were unfair based on four characteristics, among them that the loans had adjustable rates and an introductory rate period of three years or less. Id. at 739." Id. :165 Mass 775 at 785

59. "Nothing in our decision in Fremont, however, was intended to suggest that the universe of predatory home loans is limited only to those meeting the four criteria present in that case. Rather, "[t]he holding of Fremont was that [G. L. c.] 93A prohibits 'the origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay.' " Frappier v. Countrywide Home Loans, Inc., 645 F.3d 51, 56 (1st Cir. 2011), quoting Fremont, supra at 748-749." Id. 465 Mass. 775 at 786.

60. Borrower's Interest Act. The Borrower's Interest Act, G. L. c. 183, § 28C, prohibits lenders from originating certain home refinancing loans that are not in the borrower's interest. The statute provides:

"A lender shall not knowingly make a home loan if the home loan pays off all or part of an existing home loan that was consummated within the prior 60 months or other debt of the borrower, unless the refinancing is in the borrower's interest."

G. L. c. 183, § 28C (a). The statute also mandates that

"[t]he 'borrower's interest' standard shall be narrowly construed, and the burden is upon the lender to determine and to demonstrate that the

refinancing is in the borrower's interest." 465 Mass 775 at 787

## MORTGAGE WAS NOT LEGAL NOR ENFORCEABLE FROM ORIGINATION

· 61. The mortgage was much more than just an inflated appraisal at that time. Its terms

render the mortgage unconscionable, violate MGL Chapter 140D, 183C, 93A, 183 §64

regulatory interpretation at 940 CMR 8.06. As the enforceability of the mortgage is a

pivotal element of foreclosure, no statute of limitation can bar that issue from

62. The fraud at origination (both by inducement and in the factum) render any attempt at

acceleration unconscionable; Chapters 140D and 183C reopen if there is an attempt to

foreclose .. Nor would it be moral to enforce a mortgage Wells Fargo Bank N.A. has

known all along was illegal, unaffordable and unenforceable.

The unconscionable nature of the loan, visible from the loan documents itself means that

Defendant's enforcement of the illegal debt (Note) and the mortgage, means it

had unclean hands long before the attempted foreclosure (an equitable action).

As the Maxim of Equity says, "he who seeks equity must do equity".

## ADVERSE AT ORIGINATION - NOT LEGAL MORTGAGE

63. The original mortgage was "averse" to the interests of the borrower.

Pereira's loan was subprime. It was also a pick-pay loan with one bad option after another

Using FHFA's criteria of factors that make a loan "doomed to fail" and violate

expectations based on a valid underwriting of the mortgage includes a "non-

credible" and invalid appraisal of the property which clearly happened in Pereira's

case. Given that this was a subprime mortgage with a teaser rate with approval

based upon a fictitious rate with an increasing unpaid principal

balance AND monthly payment, Massachusetts case law is clear that the Defendants

. is responsible for rectifying the subprime nature of the loan. See Fremont and,

for instance, Drakopoulos v. U.S. Bank National Assn., 465 Mass. 775 (2013).

The servicers of this loan stalled and held up helpful modifications claiming either

missing papers or that she lacked enough income. As the mortgage was created by

a misrepresentation- as it was stated- she would never have enough money to pay

the loan and without a modification that rectified the origination violations, she

would never be considered able to afford it.

64. In addition, the subprime predatory mortgage specifically with its unfounded

inflation trapped him in a mortgage that was exactly doomed to fail as in Fremont

decision. It was presumptively unfair as Walsh could not have understood how he

was being trapped by the mortgage. The mortgage, therefore, violates the spirit of

Massachusetts predatory lending law 183C but additionally violates 183 §64. Unlike Ch.

183C, MGL Chapter 183 §64 has no statute of limitations and includes a mortgage that

has adverse characteristics discriminatory to the homeowner/ borrower's interest. ·

MORTGAGE WAS "DOOMED TO FAIL" AND THEREFORE, REQUIRED LOAN

MODIFICATION NOT FORECLOSURE

65. The Walsh mortgage was unlikely to succeed from the onset. As defined in the

Fremont case, if a mortgage is "doomed to fail" - if it is inherently designed to fail

whether the lender knew it or not as long as they should have known - such a loan

is illegal under Massachusetts law.

As the Court ruled in the Fremont decision, (Fremont Invest. & Loan, 452 Mass. at 743)

"The spirit of the Act is that a lender engages in predatory lending, which is an unfair act

in violation of Chapter 93A, when it makes a loan charging either high points, fees, or

interest to a borrower whom the lender reasonably believes will be unable to make the

scheduled payments and will therefore face the likelihood of foreclosure. It is noteworthy

that the issuance of such a loan is deemed to be unfair under Chapter 93A even if the

lender provides fair and complete disclosure of the terms of the loan and the borrower is

fully informed of the risks he faces in accepting the loan. The unfairness, therefore, does

not rest in deception but in the equities between the parties. See Swanson v. Bankers

Life Co., 389 Mass. 345, 349 (1983) ("In Suffolk Civil Action -17- No. 07-

4373determining whether an act or practice is unfair, as opposed to deceptive, we must

evaluate the equities between the parties"). The Legislature plainly deemed it predatory

and, thus, unfair for a lender to make a high cost home loan, quickly reap the financial

rewards from the high points, fees, or interest, and 'then collect the balance of the debt

by foreclosing on the borrower when, as the lender reasonably should have foreseen, he

cannot meet the scheduled payments. The Legislature, equally plainly, was disturbed by

mortgage foreclosures of the borrower's principal dwelling, and thought it unfair for a

lender to issue a mortgage loan that the lender reasonably believes will result in

foreclosure of the borrower's home."

66. Given the above characteristics by a regular consumer, the clearly predatory and

unconscionable loan was unlikely to succeed  violation of Massachusetts fair lending

  laws,

and violated fundamental consumer protections under MGL Chapter 93A. In such a

circumstance rather than go into foreclosure, Massachusetts courts have ruled (see

  Fremont)

that banks should provide a loan modification or refinance. When  the Defendants

foreclose on the property, they were able to buy it back far below what could have

been obtained. And, the Bank does exchange any money •

UNCONSCIONABLE LOAN UNENFORCEABLE WITHOUT MODIFICATION

THAT RENDERED IT NO LONGER UNCONSCIONABLE

67. Given that the modern mortgage is an adhesion contract - the language is pre-set and

not negotiable, a power imbalance is created by the borrower's complete

engagement" as a homeowner while the bank only has a monetary investment (see

Fremont), the originator already risked the likelihood of running afoul of an

unconscionable contract. In this case, several of the origination elements are

explicitly enumerated as illegal in 940 CMR Chapter 8 - that Walsh was rushed

through the signing without a lawyer, and not explained to Walsh so he could

understand. These are not only explicit violations of black letter law which

trigger a presumption of a consumer violation but represent a codification of elements

that render a contract unconscionable in the tradition of the common law. Wex

Legal Dictionary defines the Unconscionably Doctrine as:

"A defense against the enforcement of a contract or portion of a contract. If a contract is

unfair  oppressive to one party in a way that suggests abuses during its formation,

a court may find it unconscionable and refuse to enforce it. A contract is most

likely to be found unconscionable if both unfair bargaining and unfair substantive

terms are shown. An absence of meaningful choice by the disadvantaged party is

often used to prove unfair bargaining."

35 In fact, the clear elements of unconscionability here are perhaps best expressed in The

People's Law Dictionary by Gerald and Kathleen Hill:

"unconscionable: adj. referring to a contract or bargain which is so unfair to a party that no reasonable or informed person would agree to it. In a suit for breach of contract, a court will not enforce an unconscionable contract (award damages or order specific performance) against the person unfairly treated, on the theory that he/she was misled, lacked information or signed under duress or misunderstanding. It is similar to an "adhesion contract," in which one party has taken advantage of a person dealing from weakness."

68. No reasonable person knowing all of the elements of this mortgage, how they would interact, would of their complete free will sign such a mortgage. And thus under unconscionability, a court generally has 2 options:

"Degree of unreasonableness and unfairness of a contract or deal prompting a court to modify or nullify it." Black's_ Law.

The contract as is unenforceable. Under Restatement (Third) of Property: Mortgages § 8.1

(1997), the Pereira mortgage could not be enforced by acceleration of the total principal and foreclosed upon.

"Accrual of the Right to Foreclose-Acceleration (a) An acceleration provision is a term in a mortgage, or in the obligation it secures, that empowers the mortgagee upon default by the mortgagor to declare the full acceleration becomes effective on the date specified in a written notice by the mortgagee to the mortgagor delivered aff.er default. ... A mortgagor may defeat acceleration and reinstate the mortgage ... if: ... (3) the mortgagee has engaged in fraud, bad faith, or other conduct making acceleration unconscionable. [emphasis added]

The universally recognized meaning of not being able to accelerate and collect on the

entire debt is clarified in the Restatement commentary:

"Comment: a. Introduction. Virtually all mortgages today contain acceleration clauses. In

the event of mortgagor default, such a clause gives the mortgagee the right to

declare the entire mortgage obligation due and payable. The general validity of

these provisions is universally accepted. An acceleration provision is effective to

make the entire mortgage obligation due and payable so long as it is contained in either

the mortgage or the obligation it secures .... The absence of an acceleration provision

can have profoundly negative consequences for mortgagees. In this setting, the

mortgagee must either foreclose for each installment as it comes due or wait until the

amortization period expires to foreclose for the full accrued obligation."

With a contract unenforceable from origination, Plaintiff cannot make an equitable

argument here where it enters with unclean hands.

MORTGAGE WAS NOT LEGAL NOR ENFORCEABLE FROM ORIGINATION; NO

STATUTE OF LIMITATIONS APPLIES (UNCONSCIONABLE)

69. The origination of the Walsh mortgage rendered it unconscionable as well as

violating MGL Chapters 140D1, 183C2, 183 §64, 93A, 106 §3-305; the Common

Law; the regulatory interpretation at 940 CMR 8.06;3 and jurisprudence.

It should be noteworthy to this Honorable Court that the violations at origination trigger

violations of regulations, statutes, the Uniform Commercial Code, consumer law, and the

common law of contracts. They render the purported mortgage loan void,

unconscionable, un   accelerate-able, unenforceable, fraudulent, and beyond the

powers of this Court to confirm. No statute of limitations can protect this loan

from its unenforceability on numerous other legal bases.

70. Further, it is not a fluke that all of these legal bases conspire together to demonstrate

this loan, and any attempted claim to default, acceleration, or foreclosure, are all legally

impossible and unsupportable:

"we "construe statutes that relate to the same subject matter as a harmonious whole and

avoid absurd results." Connors v. Annino, 460 Mass. 790, 796 (2011), quoting Canton v.

Commissioner of the Mass. Highway Dep't, 455 Mass. 783, 791 792 (2010). See

Adoption of Marlene, 443 Mass. 494, 500 (2005), quoting Ciardi v. F. Hoffmann La

Roche, Ltd., 436 Mass. 53, 62 (2002) ("Statutes addressing the same subject matter

1 Section 1 0(i)(2) ... for the purposes of exercising any rescission rights after the

initiation of any judicial or nonjudicial foreclosure process on the principal

dwelling of the obligor securing an extension of credit, the disclosure of the

finance charge and other disclosures affected by any finance charge ... 2 Section

15: Affirmative claims and defenses available; applicability (b)(2) A borrower

may, at any time during the term of a high-cost home mortgage loan, employ any

defense, claim, counterclaim, including a claim for a violation of this chapter,

after an action to collect on the home loan or foreclose on the collateral securing

the home loan has been initiated or the debt arising from the home loan has been

accelerated or the home loan has

become 60 days in default, or in any action to enjoin foreclosure or preserve or obtain

possession of the home that secures the loan. 3 These violations include: Broker

or lender: provided representation or statements that were False, Misleading,

Tendency to mislead, Capacity to mislead. The Appraisal and representations that {borrower} could afford the loans trigger these. "Term, conditions and charges" were thus misrepresented. Broker failed to " give time and "reasonable" opportunity to review every document signed and those under 940 CMR 8.00" clearly are to be construed harmoniously so as to give full effect to all of their provisions and give rise to a consistent body of law")."

71. Here, enumerated, is this consistent body of law:

• The fraud at origination (both by inducement and in the factum) render any attempt at acceleration unconscionable under the Common Law; without acceleration, Defendant could not foreclose on the full outstanding debt and yet these are the facts they claim.

• Fraud in the Factum violated MGL Chapter 106 §3-305 and the Common Law of contracts - such Notes (and the mortgages attempting to rely upon them) are void ab initio.

• 940 CMR 8.05/8.06 violations also make the loan unenforceable4

• The loan violated Chapters 140D and 183C; enforcement of these violations reopens if there is an attempt to foreclose; therefore, violations of these legal chapters can then still be addressed.

• The provision of a loan adverse to ~~Davis'~~ violated MGL Chapter 183 §64; this law has no statute of limitations.

• Nor would it be just to enforce a mortgage that {Foreclosing Entity} has known all along was illegal, unaffordable, and unenforceable. Given these violations, Defendant had unclean hands since origination5

72. It was exactly from the attempted enforcement of such an illegally originated contract
and concomitant damage that our body of law was to protect {borrower} and those

similarly situated:

"' [A] statute must be interpreted according to the intent of the Legislature ascertained

from all its words construed by the ordinary and approved usage of the language,

considered in connection with the cause of its enactment, the mischief or imperfection to

4 "940 CMR 8.00 defines unfair or deceptive acts or practices. They are not intended to

be all inclusive as to the types of activities prohibited by M.G.L. c. 93A, § 2(a).

Acts or practices not specifically prohibited by 940 CMR 8.00 are not necessarily

consistent with M.G.L. c. 93A or otherwise deemed legitimate by the absence of

regulation here."

A related Maxim of Equity, "He who comes into equity must come with clean hands",

reminds the Court that the order in which the parties fail their obligations matter.

It's the original inequit  able action by the Plaintiff that denies the Plaintiff any

equitable consideration by this Court and must addressed for equity to the

Defendant. If the originator of the purported mortgage violated equity in the

origination, then the fact that the borrower later failed their obligations on the

predatory and/or unconscionable and/or void or unenforceable contract is not the

controlling equitable concern. be remedied and the main object to be

accomplished, to the end that the purpose of its framers may be effectuated."'

Industrial Fin. Corp. v. State Tax Comn., 367 Mass. 360, 364 (1975), quoting

from Hanlon v. Rollins, 286 Mass. 444,447 (1934). O'Brien v.Director of the Div.

of Employment Sec., 393 Mass. 482, 487-488 (1984)." Jinwala v. Bizzaro, 505

NE 2d 904 - Mass: Appeals Court 1987.

ORIGINATION ACTIONS VIOLATED 940 CMR 8.05/8.066

73. Based on the factual evidence recited above, Defendant engaged in all of the

following, rendering origination of the {borrower} loan illegal under "8.05: Mortgage

Disclosures":

(1) It is an unfair or deceptive act or practice for a mortgage broker or mortgage lender to

fail to make any disclosure, or fail to provide any document, to a consumer required by

and at the time specified by any applicable state or federal law, regulation or directive.

(2) It is an unfair or deceptive act or practice for a mortgage broker or lender to conceal

or to fail to disclose to a borrower any fact relating to the loan transaction,

disclosure of which may have influenced the borrower not to enter into the

transaction with the broker or lender.

(3) It is an unfair and deceptive act or practice for the mortgage broker or lender to fail to

take reasonable steps to communicate the material facts of the transactions in a

language that is understood by the borrower. Reasonable steps which shall comply

with 940 CMR .8.00 may include but shall not be limited to:

(b) providing the borrower with a copy of the disclosure forms required by any

applicable state or federal law, regulation or directive, in a language understood by the

borrower."

Wachovia engaged in the following acts explicitly prohibited under "8.06: Prohibited

Practices":

"(6) It is an unfair or deceptive act or practice for a mortgage broker or lender to

procure or negotiate for a borrower a mortgage loan with ... other terms ... which are otherwise unconscionable."

"(11) It is an unfair or deceptive act or practice for a mortgage broker or lender to fail to give to the borrower or his or her attorney the time and reasonable opportunity to review every document signed by the borrower and every document which is required pursuant to 940 CMR 8.00, prior to the disbursement of the mortgage funds."

COUNT FIVE

VIOLATIONS OF G.L. CHAPTER 244 SECTION 35 A, B AND C

74. The plaintiff made multiple applications for modification.  Also, in most cases, the Defendants did not provide the Plaintiff with any of its calculations.  Under Chapter 244 Section A, B and C, the Defendants were required to determine the borrowers (Plaintiff's) current ability to make an affordable monthly payment.  Secondly, the lender is required to identify a mortgage, loan that achieves the borrowers affordable monthly Payment: reduction in principle, reduction in interest rate, or an increase in amortization period.  Finally the statute requires that the mortgage company conducts a comparative analysis comparing the new present value of the modified mortgage and the anticipated net recovery that would result from  the foreclosure:  Which would give the greater return to the investors.  The results must be made available to the mortgagor (the plaintiff etc.).

75. The mortgage company is required to follow these and other related guidelines to see what the homeowner can and cannot afford.  The Net Present Value (NPV) is a complicated series of calculations that must be done and there must be transparency.  The calculations must be made available and given to the homeowner (Plaintiff).  They were

not given to the Plaintiff.

76. As the records attached shows the Plaintiff was not effectively assisted in the modification efforts.  For years application were lost or mislaid.  Information already supplied was asked for over and over again.

However, the above-named law is clear.  A foreclosing mortgagee is BY AFFIDAVIT to assert that: (1) They hold the original note properly assigned or that they are the agent of said party and (2) That reasonable efforts have been made to prevent foreclosure.

77.  Massachusetts law at all levels requires an affidavit to be based on personal knowledge. It is explicitly that personal knowledge means what has been perceived through senses based on one's personal experience. Massachusetts Rules of evidence rule 803, the hearsay exception for affidavits does have a records exception, but it is formulated quite differently from the federal rule and is explicitly only for the purposes of getting the document itself into the record; here, Defendant tries to use the affidavit as a substitute for producing the document which is the opposite of the requirement under subsection (6) of Massachusetts Rule 8036; therefore, the Rule does not provide a basis to not provide the record in question.

78. The cognate federal rule is Federal Rules of Evidence 803 also has a subsection (6), but in the case of this rule, the federal rules diverge significantly from Massachusetts Rules

Evidence 7 and allow a much broader hearsay exception for not providing the document based on an affidavit. However, even the Federal Rule 803 exceptions require that the affiant have personal experience in the creation of the business document in

question. Here, the signatory had nothing to do with the creation of the wet ink note. The signatory

does not work for the organization whose ownership of the note which would presumably be a pre-requisite for having the personal knowledge of the steps necessary to acquire and have the physical still negotiable wet ink note as well as experience in all of the steps by which the organization for whom the signatory does not work must take to acquire ownership interest in the note.

79. The signatory does not even pretend to work for the purported note owner. The affiant

does not pretend to have personal knowledge of the physical wet ink note still in a negotiable form. The signatory does not pretend to be part of the process by which a separate organization acquires an ownership interest in the note nor how that organization authenticates that the document it believes it has is in fact the original wet ink note. Further under Massachusetts regulation 209 CMR 18.21A promulgated effective Oct 11, 2013 section (1) opens with:

"a third party loan servicer may not use unfair or unconscionable means in servicing any mortgage loan. Without limiting the general application of the foregoing ...

Section (2) specifically states that: "under the subject information and documentation provided by third party loan servicers in the context of foreclosure proceedings. To the extent a servicer is authorized to act on behalf of a mortgagee ... a third party loan servicer that all foreclosure affidavits are sworn statements are based on personal knowledge. B ... Foreclosure affidavits are sworn statements

shall set forth a detailed description of the basis of the affiant's personal knowledge of

information contained in the affidavit or sworn statement, including sources of all

> information recited and a statement as to why the sources are accurate and
>
> reliable."

The signatory, claimed affiant, herein explicitly does not say that they have personal

knowledge of the purported wet ink note still in negotiable form, specifically does not

> layout a basis of personal knowledge about the creation of the sources of all
>
> information recited in the purported affidavit document.

Therefore these failings not only mean that what was supplied was not an affidavit but

also that the use was "unfair" and "unconscionable" in servicing. (that the recordation of

> the document didn't add any value to it and cite the federal reasoning for why
>
> under federal rule of evidence rule 803) (the quote on what personal knowledge of
>
> the creation of a document means

even under the federal standard where in MA an affidavit can only be used to get the

> actual document in

Further, MA rules of evidence require in trial that the party in question produce the best

evidence not just any purported evidence. Here this is not even an affidavit that would

> meet any standard of an affidavit and therefore could not possibly meet the Eaton
>
> standard but even under Eaton, once challenged, Defendant needs to meet the best
>
> rules of evidence standard in

Massachusetts under the rules promulgated by the Massachusetts Supreme Judicial Court.

As Eaton decision reaffirmed, without a debt, a mortgage is a

"nullity." The original Note is like a check; only the original

is of any evidentiary value. Only the original can demonstrate

whether it has the maker's original signature and whether it now

has a facial defect or is otherwise no longer negotiable.

To prove its case, the foreclosing entity had to provide the

best evidence. It had to have the wet ink Note to foreclose, it

must produce it or provide a clear reason it cannot:

"An original writing or record is required in order to

prove its content unless these sections, a statute, or the

common law provides otherwise." §1002. Requirement of

original (Best Evidence Rule), Mass Guide To Evidence

(2019)

See Commonwealth v. Ocasio, 434 Mass 1, 6 (2001):


## PRAYER FOR RELIEF

WHEREFORE, The Plaintiff respectfully requests the following relief:

   A Enjoin any other entity from foreclosing on the property at 116 Outlook Road,

Marshfield, MA 02050.  There is an auction scheduled for January 20, 2022.

   B. requiring that ANY entity be required to produce the original note properly

assigned to establish their collection and or foreclosure rights under the mortgage.  As a

substitute an affidavit probing that they are operating as the agent of such an entity is

required.

   C. Enter a judgment declaring that the acts and practices of the Defendants

complained of herein to constitute a breach of contract and a breach of the

covenant of good faith and fair dealing, as well as a declaration that they are required

to re-deed the property to Plaintiff, as promised on numerous occasions, as well as a

declaration that that the Defendants are required by the Doctrine of Promissory

Estoppel to give the Plaintiff the modification as promised and originally given.

D. Order the Defendants not to interfere with the use, occupancy

and enjoyment of the property at 116 Outlook Road, Marshfield, MA 02050

E. US Bank National Association/ Fay Servicing to return all mortgage monies paid

by the plaintiff to the mortgagee.

F. Order other holding mortgage payments to return all mortgage monies paid by the

Plaintiff to them.

E. Grant a permanent and final injunction enjoining the Defendants and agents

employees, affiliates and subsidiaries from continuing to harm Plaintiff.

F. Order specific performance of Defendant's contractual obligations together

with other relief required by law and contract and law.

G. Award actual and punitive damages to the plaintiff

H. Award the Plaintiff the costs of this action, including the fees and costs of

any experts called, together with reasonable attorney's fees.  Also, repay Plaintiff

all monies paid to Defendant.

I. Grant Plaintiff such and other and further relief as this Court finds necessary

and proper.


## VERIFIED DECLARATION

I, Stephen J. Walsh declare as follows:
1. I am the owner of the property located at  116 Outlook Rd., Marchfield, 02050. I am
   also the mortgagor regarding the mortgage by Fay servicing LLLC and US Bank
   Trust N.A.. I am also the plaintiff in this lawsuit

2. I have personal knowledge of the issues concerning all of the mortgages and the others, including those set out in the foregoing Complaint, and if called upon to testify I would competently testify as to the matters stated herein.
3. I verify under penalty of perjury that the fact set forth in this complaint are true to the best of my knowledge and that all of the assertions are true and correct.

Signed under the pains and penalties of perjury this Seventeenth day of January in the 2021

Stephen J. Walsh

DATE: January 18, 2022

Respectfully submitted
On Behalf of the Plaintiff
Stephen J. Walsh

Robert K. Cabana BBO 641885
1354 Hancock St., Suite 206
Quincy, MA 02169
Tel no. 617-405-4283
Rkc6068@aol.com

AFFIDAVIT OF STEPHEN J. WALSH

I, Stephen J. Walsh, Take Oath and Swear the Following:

. Our family has been trying to resolve communication with our mortgage company since 2007. As background We entered into a interest only, variable rate mortgage in 2006. I was told we would refinance that mortgage within 1 to 2 years from the mortgage broker. We were rushed through the process. We did not have a lawyer present. The mortgage was a 2/28 adjustable rate, which could reach a high of nearly 15%. In the year 2007 our house was appraised at a much lower value than the previous year and we found ourselves "upside down" in our mortgage and unable to re-finance.

The mortgage was a stated income and adjustable-rate mortgage and for a short period an interest only mortgage. I now know that under state cases it would be considered a "structurally unfair mortgage".

We continued to pay the mortgage for several years and each year our mortgage payment amount continued to rise, until our family could no longer afford the payments. We continued to contact HSBC mortgage with no solution or communication.

Since that time we have been unable to resolve our current mortgage and we are asking for resolution from the state court.

In 2016 as part of a Possible: "settlement" we were offered an awful "modification" with a $200,000 balloon payment at the end. We were not in a position to take such a settlement. The monthly payment would also go up.

We asked also to view a "wet ink" copy of our note and was sent a copied note in lieu of viewing the actual note. Therefore; I have NEVER seen the original note.

I was sick at home from Dec 17, 2016 through-Jan 2, 2017 at which I thought was a very badly congested cold. I was later admitted into South Shore Hospital on the evening of Jan 2, 2017 with a diagnosis as a necrotic pneumonia, a very dangerous form of pneumonia. I remained in the hospital for almost two weeks as treatments were applied and my lung was drained of a liter of fluid. I was released on Jan 15, 2017 and remained for 2 weeks on self-administered antibiotics intravenously through a Picc line, which was installed in my arm to my chest area. I am still recovering from this incident; but,

finally was able to work in part of February and most of March.

During March, I was getting slowly back to normal. As of now I feel almost 100% normal. I feel able to perform my duties.

Obviously, I went through a life threatening situation. Most people who contract this type of pneumonia die. My recovery to full strength has been somewhat gradual. . I apologize for delays in communication through the period.

Also, my income has increased dramatically since I was sick in early 2017. I have also been able to pay my wife for work as an assistant. The total household income is now over $4,000 per month.

I look forward to being able to institute and adversary proceeding or lawsuit regarding my many mortgage issues. I am not unmindful of the

need to provide documentation on a timely and complete basis. I, also, look forward to continuing to work together to find the best solution for our family with our current mortgage situation.

In 2019, We were offered a temporary restructured loan for 6 months of payments with no details on final mortgage payments and terms. We chose not to accept that communication and continue to request resolution.

We asked on multiple occasions for the right to see the original wet ink" note. We asked the foreclosure attorneys and the mortgagee directly in 2019 and 2020.

The mortgagee has never tried to offer a reasonable, despite outreach on my part. In no way did they assist me in prevent me from being foreclosed again

In closing, for almost 7 years we have been trying to communicate and resolve our mortgage and the mortgage company has simply tried to foreclose on our home several times which has been a stressful to our family

I have also learned that the affidavits that were filed in lieu of providing the note were by persons who had no personal knowledge of the existence or condition of the note


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS SIXTEENTH DAY OF JANUARY IN THE YEAR

2022

Stephen J. Walsh

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 3 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 50 of 80

ge 2 of 22)

Return To:
Wilmington Finance, a division of AIG Federal Savings Bank
401 Plymouth Road, Suite 400
Plymouth Meeting, PA  19462

Prepared By:
Wilmington Finance, a division of AIG Federal Savings Bank
650 Ten Rod Road
North Kingstown, RI  02852

————————————————[Space Above This Line For Recording Data]————————————————

## MORTGAGE

Loan Number:                                    MIN 100372406011906572

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   January 11, 2006                     ,
together with all Riders to this document.
(B) "Borrower" is
STEPHEN J. WALSH AND ANN M. WALSH

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS       Form 3022  1/01

(VMP)-6A(MA) (0401)
Page 1 of 16                          Initials: A W AMW
       VMP Mortgage Solutions (800)521-7291
DDS-MAY

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 4 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 51 of 80

ge 3 of 22)

**(D) "Lender"** is

Wilmington Finance, a division of AIG Federal Savings Bank
Lender is a Federal Savings Bank
organized and existing under the laws of United States of America
Lender's address is 401 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462

**(E) "Note"** means the promissory note signed by Borrower and dated   January 11, 2006
The Note states that Borrower owes Lender Four Hundred Five Thousand  & 00/100

Dollars

(U.S. $405,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than February 01, 2036

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used

Initials: _AW_ _Aw_

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 5 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 52 of 80

ge 4 of 22)

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the County of PLYMOUTH :

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: L05-8-7                                        which currently has the address of
116 OUTLOOK ROAD                                                                       [Street]
MARSHFIELD                                      [City] , Massachusetts       02050       [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials AW AKL

-6A(MA) (0401)                          Page 3 of 15                          Form 3022   1/01
DDS-MAY

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

ge 7 of 22)

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 8 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 55 of 80

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 9 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 56 of 80

ge 8  of  22)

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

ge 9 of 22)

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 10 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 57 of 80

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 11 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 58 of 80

ge 10 of 22)

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

ge 11 of 22)

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 12 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 59 of 80

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Case 1:16-cv-11580-GAO  Document 2-5  Filed 08/03/16  Page 13 of 23
Case 1:22-cv-10092-RGS  Document 1-3  Filed 01/24/22  Page 60 of 80

ge 12  of  22)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

ge 13 of 22)

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 14 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 61 of 80

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Case 1:16-cv-11580-GAO Document 2-5 Filed 08/03/16 Page 15 of 23
Case 1:22-cv-10092-RGS Document 1-3 Filed 01/24/22 Page 62 of 80

ge 14 of 22)

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall he sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 16 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 63 of 80
ge 15 of 22)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
                          -Borrower

STEPHEN J. WALSH

_____ (Seal)
                          -Borrower

ANN M. WALSH

_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower

-6A(MA) (0401)                    Page 14 of 15              Form 3022  1/01
DDS-MAY

A true copy of document filed in
Plymouth District of the Land Court
on JAN 17, 2006 at 10:30AM.
as Document No. 597812
Attest: John R. Buckley Jr.
Assistant Recorder

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 18 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 65 of 80

ge 17 of 22)

COMMONWEALTH OF MASSACHUSETTS,                    PLYMOUTH          County ss:

On this **11th** day of **January 2006**           , before me, the undersigned notary public,
personally appeared
                    Stephen J. Walsh and Ann M. Walsh


proved to me through satisfactory evidence of identification, which was/were **drivers license**
to be the person(s) whose name(s) is/are signed on the preceding document, and acknowledged to me that
he/she/they signed it voluntarily for its stated purpose.
My Commission Expires:  **11/7/08**
(Seal)

                                              Notary Public /Stephen P. Feeney

STEPHEN P. FEENEY
Notary Public
Commonwealth of Massachusetts
My Commission Expires
November 7, 2008

Initials: _____ _____                              Form 3022  1/01

VMP -6A(MA) (0401)                Page 16 of 15
DDS-MAY

Case 1:16-cv-11580-GAO Document 2-5 Filed 08/03/16 Page 19 of 23
Case 1:22-cv-10092-RGS Document 1-3 Filed 01/24/22 Page 66 of 80

ge 18 of 22)

# ADJUSTABLE RATE RIDER
(LIBOR Index - Rate Caps)

Loan Number:

THIS ADJUSTABLE RATE RIDER is made this    11th    day of    January, 2006    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to
Wilmington Finance, a division of AIG Federal Savings Bank,
Federal Savings Bank
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

116 OUTLOOK ROAD
MARSHFIELD, MA 02050
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of          8.800 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of      February, 2008      , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

WILMINGTON - MODIFIED
MULTISTATE ADJUSTABLE RATE RIDER (LIBOR Index) - Single Family - Freddie Mac UNIFORM INSTRUMENT

-815R (0008)    Form 3192 1/01
Page 1 of 4    Initials:
VMP MORTGAGE FORMS - (800)521-729

D05-GAO

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 20 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 67 of 80

ge 19 of 22)

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FOUR AND 100/1000                      percentage points (                      4.100%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.800 % or less than                      8.800 %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 14.800 %, or less than 8.800 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

Initials: ___

815R (0008)                      Page 2 of 4                      Form 3192 1/01

DDS-GAO

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 21 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 68 of 80

ge 20 of 22)

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: _____

815R (0008)                    Page 3 of 4                    Form 3192 1/01

DDS-GAO

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 22 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 69 of 80

ge 21 of 22)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
STEPHEN J. WALSH            -Borrower

_____ (Seal)
ANN M. WALSH               -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

-815R (0008)                    Page 4 of 4                    Form 3192 1/01
DDS-GAO

Case 1:16-cv-11580-GAO   Document 2-5   Filed 08/03/16   Page 23 of 23
Case 1:22-cv-10092-RGS   Document 1-3   Filed 01/24/22   Page 70 of 80

ge 22 of 22)

Exhibit A

That certain parcel of land situate in Marshfield in the County of Plymouth, Commonwealth of Massachusetts, dated April 27, 1968, filed with Certificate of Title No, 29311.

There is excepted and excluded from the land the fee in Outlook Road abutting said lot.

Said lot is subject to a reservation as set forth in a certain deed from Leader Construction Corporation to Dainel Webster Estates Electric Company and New England Telephone and Telegraph Company, dated June 9, 1954, duly recorded in Book 2558, Page 453.

Said lot is also subject to rights as ast forth in a grant made by Walton Hall, Jr. et al, Trustees, to G. Milton Avery et al, Trustees, dated May 5, 1953, duly recorded in Book 2270, Page 409, in common with all other persons lawfully entitled thereto.

Said Lot is also subject to an easement from Atlantic Venture Corporation to New Bedford Gas and Edison Light Company and New England Telephone and Telegraph Company dated September 12, 1973, field and registered as document #154101.

There is appurtenant to said lot certain rights as set forth in a certain deed from Atlantic Realty Trust of Marshfield by Trustee to Atlantic Venture Corporation, dated January 9, 1973, filed and registered as document #148079.

There is also appurtenant to said lot certain rights as set forth in said deed, document #1605471.

For our Title Certificate of Title No. 108453, Document No. 598733.

*****This mortgage hereby subordinated to an existing Declaration of Homestead dated December 21, 2005 and recorded at the Plymouth County Registry of Deeds at Document No. 598734 on December 22, 2005.*****

Lot 150 on Plan #28405F filed w/ Cert 29311

RECORDING REQUESTED BY AND WHEN RECORDED RETURN TO:
CALIBER HOME LOANS
13801 Wireless Way
Oklahoma City, OK  73134

Prepared By:     **Neeraj Ragta**                    Loan Number: ▮▮▮▮▮▮▮

MERS Min::       **100372406011906572**

Parcel ID::      **L05-8-7**

_____

Space Above This Line For Recorder's Use

## ASSIGNMENT OF MORTGAGE/DEED OF TRUST

FOR VALUE RECEIVED, the undersigned **HSBC MORTGAGE SERVICES, INC.** whose address is **636 GRAND REGENCY BLVD., BRANDON, FL  33510**, hereby grants, assigns and transfers to **U.S. BANK TRUST, N.A., AS TRUSTEE FOR LSF9 MASTER PARTICIPATION TRUST** whose address is **13801 WIRELESS WAY, OKLAHOMA CITY, OK  73134** all beneficial interest under that certain mortgage/Deed of Trust/Security Deed dated 01/11/2006 executed by **STEPHEN J WALSH** and **ANN M WALSH** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR WILMINGTON FINANCE, A DIVISION OF AIG FEDERAL SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS** in the amount of **$405,000.00** and recorded on **1/17/2006** as Instrument # 599812, in Book/Volume or Liber No. N/A , Page/folio N/A of Official Records in the County Recorder's office of **PLYMOUTH** County, MA, describing land herein as: *Certificate of Title No. 108453, For Authority, see Power of Attorney recorded in Plymouth County registry  of Deeds in Book 45116, page 173 **'SEE ATTACHED 'EXHIBIT A'**

Property Address:     **116 OUTLOOK ROAD, MARSHFIELD MA  02050**

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said mortgage/Deed of Trust/Security Deed.

Witness #1 _Gary Jacobi_

Witness #2 _Ashley Lawson_

**HSBC MORTGAGE SERVICES, INC., BY CALIBER HOME LOANS INC., AS ITS ATTORNEY IN FACT**

By: _Melinda Girardeau_

Title: **Authorized Signatory**

Date: _May 7, 2015_

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

County of  San Diego )
State of  California )

On _May 7, 2015_ before me, _Angelika G. Garrow,_ Notary Public, personally appeared _Melinda Girardeau_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand official seal,

Notary Name: _Angelika G. Garrow_                    My Commission Expires: _4-12-17_



ANGELIKA G. GARROW
Commission # 2033089
Notary Public - California
San Diego County
My Comm. Expires Jul 12, 2017

Exhibit A

That certain parcel of land situate in Marshfield in the County of Plymouth, Commonwealth of Massachusetts, dated April 27, 1968, filed with Certificate of Title No, 29311.

There is excepted and excluded from the land the fee in Outlook Road abutting said lot.

Said lot is subject to a reservation as set forth in a certain deed from Leader Construction Corporation to Dainel Webster Estates Electric Company and New England Telephone and Telegraph Company, dated June 9, 1954, duly recorded in Book 2558, Page 453.

Said lot is also subject to rights as ast forth in a grant made by Walton Hall, Jr. et al, Trustees, to G. Milton Avery et al, Trustees, dated May 5, 1953, duly recorded in Book 2270, Page 409, in common with all other persons lawfully entitled thereto.

Said Lot is also subject to an easement from Atlantic Venture Corporation to New Bedford Gas and Edison Light Company and New England Telephone and Telegraph Company dated September 12, 1973, field and registered as document #154101.

There is appurtenant to said lot certain rights as set forth in a certain deed from Atlantic Realty Trust of Marshfield by Trustee to Atlantic Venture Corporation, dated January 9, 1973, filed and registered as document #148079.

There is also appurtenant to said lot certain rights as set forth in said deed, document #1605471.

For our Title Certificate of Title No. 108453, Document No. 598733.

*****This mortgage hereby subordinated to an existing Declaration of Homestead dated December 21, 2005 and recorded at the Plymouth County Registry of Deeds at Document No. 598734 on December 22, 2005.*****

Lot 150 on Plan #28405F filed w/ Cert 29311

 **CALIBER HOME LOANS**

FOR RETURN SERVICE ONLY
Please do not send mail to this address
P.O. Box 619063



### NOTICE OF SERVICING TRANSFER

The servicing of your mortgage loan is being transferred, effective 2021-01-20. This means that on or after this date, a new servicer will be collecting your mortgage loan payments from you. Nothing else about your mortgage loan will change.

Caliber Home Loans, Inc. (Caliber) is now collecting your payments, but we will stop accepting payments received from you after 2021-01-19.

Fay Servicing, LLC will start accepting payments received from you on 2021-01-20 at this address:

**Fay Servicing, LLC**
**PO Box 88009 Chicago,IL 60680-1009**

If you have any questions about your mortgage loan or this transfer, please use the contact information below:

Current Servicer:

Caliber Home Loans, Inc.
Customer Service
800-401-6587
P.O. Box 24610
Oklahoma City, OK 73124

New Servicer:

Fay Servicing, LLC
Customer Service Department
800-495-7166
P.O. BOX 814609
DALLAS,TX 75381-4609

Important note about insurance: If you have any type of optional insurance such as mortgage life or disability insurance, premiums will not be transferred to Fay Servicing, LLC and will be discontinued. Please contact the provider of the optional insurance or other membership product(s) directly regarding continuation privileges, if applicable.

Under Federal Law, during the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer on or before its due date may not be treated by the new servicer as late, and a late fee may not be imposed on you.

Caliber Home Loans, Inc.
12/25/2020



RETURN SERVICE ONLY
P.O. BOX 619063
DALLAS, TX 75261-9063

2/1/21

[laddercoded address lines]

5-775-16643-0000253-001-1-000-000-000-000



STEPHEN J WALSH
116 OUTLOOK RD
MARSHFIELD MA  02050-4116

Account Number: ▓▓▓▓▓▓
RE: 116    OUTLOOK RD
MARSHFIELD  MA 02050

### Fair Debt Collections Practices Act (FDCPA) Validation Notice

(1.) According to Fay Servicing records, including information that has been received from the prior servicer, Caliber Home Loans, Inc, the amount of your debt as of 1/19/2021 is provided below

(2.) We are collecting the debt on behalf of: U.S. Bank Trust, N.A., as Trustee for LSF9 Master Participation Trust.

(3.) Current Monthly Payment Amount: $3,721.01

(4.) Payment Due Date: 07/01/2011

(5.) Summary of Total Debt:

**Principal Balance, Interest, Escrow and Other Debt:**

| | |
|---|---|
| Current Principal Balance: | $399,916.51 |
| Current Deferred Balance: | $5,940.00 |
| Current Unpaid Accrued Interest: | $339,392.31 |
| Escrow Balance: | $0.00 |
| Escrow Advance Balance: | $66,277.22 |
| Late Charges: | $0.00 |
| Other Charges: | $40,635.30 |
| Partial Payments not yet applied: | $0.00 |
| **Total Amount of Debt:** | **$852,161.34** |

(6.) The total amount of your debt is subject to change as a result of interest and other charges (such as Late Charges, Legal fees and Costs, and other charges). Please call Fay Servicing at 1-800-495-7166 for a current payoff at the time of any payment.

(7.) Pursuant to the Federal Fair Debt Collections Practice Act, if you do not notify us within thirty days after receipt of this notice that you dispute the validity of the debt or any portion thereof, the debt will be assumed to be valid by Fay Servicing.

(8.) If you notify Fay Servicing in writing within thirty days after receipt of this notice, that the debt, or any portion thereof, is disputed, Fay Servicing will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you.

(9.) Upon your written request within thirty days after receipt of this notice, Fay Servicing will provide you with the name and address of the original creditor, if different from the current creditor.

Fay Servicing LLC is a debt collector, and information you provide to us may be used to collect a debt. However, if you have filed for bankruptcy, we will fully respect any applicable automatic stay, modification or discharge. Further, if you filed Chapter 7 bankruptcy, received a discharge, and this loan was not reaffirmed in the bankruptcy case, we will exercise only in rem rights as allowed under applicable law and will not attempt any act to collect, recover or offset the discharged debt as your personal liability. Our office hours are Monday-Thursday 8am-9pm, Friday 8:30am-5pm, and Saturday 10am-4pm, CST. Call today: 1-800-495-7166. NMLS ID# 88244



RETURN SERVICE ONLY
P.O. BOX 619063
DALLAS, TX 75261-9063

Fay Servicing, LLC
1601 LBJ Freeway, Suite 150
Farmers Branch, TX 75234
800-495-7166

January 27, 2021



5-775-16588-0000010-001-1-000-000-000-000
STEPHEN J WALSH
116 OUTLOOK RD
MARSHFIELD MA  02050-4116

Account Number: ███████
RE: 116 Outlook Rd Marshfield MA 02050

Our records indicate your loan is greater than 30 days past due and is now in default.  Please remit the total amount due of $204,655.55 to bring your loan current today. You may mail the payment to:

Fay Servicing LLC
P.O. Box 88009
Chicago, IL  60680-1009

If you're having difficulty making your payment, please call us to discuss options available (800) 495-7166. Our regular business hours are 8:00 A.M. to 9:00 P.M. Monday - Thursday, 8:30 A.M. to 5:00 P.M. Friday, & 10:00 A.M. to 4:00 P.M. Saturday, Central Standard Time.

### Massachusetts Debt Collections Validation Notice

(1.)   According to Fay Servicing records the amount of your debt as of January 27, 2021 is provided below:

(2.)   We are collecting the debt on behalf of: Volt 2019-npl5

(3.)   Current Monthly Payment Amount: $3,721.01

(4.)   Payment Due Date: 07-01-16

(5.)   Summary of Total Debt:

Principal Balance, Interest, Escrow and Other Debt:

| | |
|---|---|
| Current Principal Balance | $399,916.51 |
| Current Deferred Balance | $0.00 |
| Current Unpaid Accrued Interest | $164,007.48 |
| Escrow Advance Balance | $66,277.22 |
| Recoverable Corporate Advances | $40,635.30 |
| Late Charges | $0.00 |
| Bad Check Fees | $0.00 |
| Other Charges | $0.00 |
| Partial Payments not yet applied | $0.00 |
| Total Amount of Debt | $670,836.51 |
| Escrow Balance | $0.00 |

5-775-18688-0000010-001-2-000-000-000-000



(6.)   **The total amount of your debt is subject to change as a result of interest and other charges (such as Late Charges, Legal fees and Costs, and other charges). Please call Fay Servicing at 1-800-495-7166 for a current payoff at the time of any payment.   Our office hours are Monday-Thursday 8am-9pm, Friday 8:30am-5pm, and Saturday 10am-4pm.**

(7.)   Pursuant to the Massachusetts Debt Collection Regulations, if you do not notify us within thirty days after receipt of this notice that you dispute the validity of the debt or any portion thereof, the debt will be assumed to be valid by Fay Servicing.

(8.)   If you notify Fay Servicing in writing within thirty days after receipt of this notice, that the debt, or any portion thereof, is disputed, Fay Servicing will obtain verification of the debt or a copy of a judgment against you and a copy of such verification or judgment will be mailed to you.

(9.)   Upon your written request within thirty days after receipt of this notice, Fay Servicing will provide you with the name and address of the original creditor, if different from the current creditor.

Fay Servicing LLC is a debt collector, and information you provide to us may be used to collect a debt. However, if you have filed for bankruptcy, we will fully respect any applicable automatic stay, modification or discharge. Further, If you filed Chapter 7 bankruptcy, received a discharge, and this loan was not reaffirmed in the bankruptcy case, we will exercise only in rem rights as allowed under applicable law and will not attempt any act to collect, recover or offset the discharged debt as your personal liability. Our office hours are Monday-Thursday 8am-9pm, Friday 8:30am-5pm, and Saturday 10am-4pm, CST. Call today: 1-800-495-7166. NMLS ID# 88244

SP106

# DOONAN, GRAVES & LONGORIA, LLC
## ATTORNEYS AT LAW

Serving Massachusetts, Maine,
New York & New Hampshire
Hours: Monday – Friday 9 am – 4 pm
www.dgandl.com

100 Cummings Center, Suite 225D
Beverly, Massachusetts 01915
TEL: (978) 921-2670
FAX: (978) 921-4870

January 10, 2020

Ann M. Walsh
116 Outlook Road
Marshfield, MA 02050

<u>Via First Class Mail and Certified Mail</u>

RE:   116 Outlook Road, Marshfield, MA 02050
        Loan Number: XXXXXX4604

## NOTICE CONFIRMING YOUR RIGHT TO REINSTATE YOUR LOAN UP TO THE TIME OF THE FORECLOSURE SALE

Dear Mortgagor,

Please be advised that this office represents Caliber Home Loans, Inc. as loan servicer for U.S. Bank Trust, N.A., as Trustee for LSF9 Master Participation Trust.

This notice is sent to inform you that you have the right to reinstate after acceleration. Notwithstanding any language contained in your Mortgage, or otherwise, that limits your post-acceleration right to reinstate your loan to five days prior to a foreclosure sale or otherwise, **you may still reinstate and avoid foreclosure by paying the total amount past-due at <u>any time</u> before a foreclosure sale takes place.**

If you would like to know the total past-due amount that you must pay to reinstate your mortgage and avoid foreclosure, please contact Doonan, Graves & Longoria, LLC to request a written itemization of the total past-due amount.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

**If you did not (1) execute the Promissory Note relating to this mortgage; (2) are in bankruptcy; or (3) have been discharged in bankruptcy, this letter is for informational purposes only and is not intended as an attempt to collect a debt or an act to collect, assess or recover all or a portion of the debt from you personally.**

Very truly yours,

Reneau J. Longoria, Esq. (BBO#635118)
Brian C. Linehan, Esq. (BBO#690437)
Patrick D. Beaton, Esq. (BBO#661215)
Elizabeth W. Dailey, Esq. (BBO#562178)
Attorneys for the Plaintiff

| SUMMONS AND TEMPORARY RESTRAINING ORDER | DOCKET NUMBER<br><br>**2283CV00039** | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

| CASE NAME<br>Stephen J Walsh vs. Caliber Home Loans et al | Robert S. Creedon, Jr., Clerk of Courts |
|---|---|

| TO<br><br>**US Bank Trust National Association** | COURT NAME & ADDRESS<br>Plymouth County Superior Court - Brockton<br>72 Belmont Street<br>Brockton, MA 02301 |
|---|---|

To the above named defendant(s):

You are hereby summoned and required to serve upon, plaintiff's attorney:

> **Robert K Cabana, Esq.**
> **Robert K. Cabana Attorney**
> **1354 Hancock St**
> **Suite 206**
> **Quincy, MA 02169**

an answer to the complaint/3rd party complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint/3rd party complaint. You are also required to file your answer to the complaint/3rd party complaint in the office of Clerk of this Court at Brockton either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application has been made in said action for a Preliminary Injunction. A hearing will be held at the court house on:

Date: **01/25/2022**

Time: **03:00 PM**

Session: **Civil B Brockton**

Session Location: **Plymouth County Superior Court - Brockton**

at which time you may appear and show cause why such application should not be granted. In the meantime, until such hearing, **WE COMMAND YOU**, US Bank Trust National Association and your agents, attorneys and counselors, and each and every one of them:

**to refrain from foreclosing on the property located at 116 Outlook Road, Marshfield, MA 02050**

| DATE ISSUED<br>**01/19/2022** | ASSOCIATE JUSTICE<br>**Hon. Brian Glenny** | ASSISTANT CLERK<br>X | SESSION PHONE# |
|---|---|---|---|

Date/Time Printed 01-19-2022 13:40:59

SCV020\ 11\ 2014

| **SUMMONS AND TEMPORARY RESTRAINING ORDER** | DOCKET NUMBER 2283CV00039 | **Trial Court of Massachusetts The Superior Court** |
|---|---|---|

| CASE NAME: Stephen J Walsh vs. Caliber Home Loans et al | Robert S. Creedon, Jr., Clerk of Courts |
|---|---|

| TO: **Fay Servicing LLC** | COURT NAME & ADDRESS Plymouth County Superior Court - Brockton 72 Belmont Street Brockton, MA 02301 |
|---|---|

To the above named defendant(s):

You are hereby summoned and required to serve upon, plaintiff's attorney:

**Robert K Cabana, Esq.**
**Robert K. Cabana Attorney**
**1354 Hancock St**
**Suite 206**
**Quincy, MA 02169**

an answer to the complaint/3rd party complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint/3rd party complaint. You are also required to file your answer to the complaint/3rd party complaint in the office of Clerk of this Court at Brockton either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application has been made in said action for a Preliminary Injunction. A hearing will be held at the court house on:

**Date: 01/25/2022**

**Time: 03:00 PM**

**Session: Civil B Brockton**

**Session Location: Plymouth County Superior Court - Brockton**

at which time you may appear and show cause why such application should not be granted. In the meantime, until such hearing, **WE COMMAND YOU**, Fay Servicing LLC and your agents, attorneys and counselors, and each and every one of them:

**to refrain from foreclosing on the property located at 116 Outlook Road, Marshfield, MA 02050**

| DATE ISSUED **01/18/2022** | ASSOCIATE JUSTICE **Hon. Brian Glenny** | ASSISTANT CLERK X | SESSION PHONE# |
|---|---|---|---|

Date/Time Printed  01-18-2022 16-21-32

SCV020\11/2014

| **SUMMONS AND TEMPORARY RESTRAINING ORDER** | DOCKET NUMBER<br><br>**2283CV00039** | **Trial Court of Massachusetts**<br>**The Superior Court**  |
|---|---|---|
| CASE NAME:<br>Stephen J Walsh vs. Caliber Home Loans et al | | Robert S. Creedon, Jr., Clerk of Courts |
| TO:<br>**Caliber Home Loans** | | COURT NAME & ADDRESS<br>Plymouth County Superior Court - Brockton<br>72 Belmont Street<br>Brockton, MA 02301 |

To the above named defendant(s):

You are hereby summoned and required to serve upon, plaintiff's attorney:

**Robert K Cabana, Esq.**
**Robert K. Cabana Attorney**
**1354 Hancock St**
**Suite 206**
**Quincy, MA 02169**

an answer to the complaint/3rd party complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint/3rd party complaint. You are also required to file your answer to the complaint/3rd party complaint in the office of Clerk of this Court at Brockton either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application has been made in said action for a Preliminary Injunction. A hearing will be held at the court house on:

**Date: 01/25/2022**

**Time: 03:00 PM**

**Session: Civil B Brockton**

**Session Location: Plymouth County Superior Court - Brockton**

at which time you may appear and show cause why such application should not be granted. In the meantime, until such hearing, **WE COMMAND YOU**, Caliber Home Loans and your agents, attorneys and counselors, and each and every one of them:

**to refrain from foreclosing on the property located at 116 Outlook Road, Marshfield, MA 02050**

| DATE ISSUED<br>**01/18/2022** | ASSOCIATE JUSTICE<br>**Hon. Brian Glenny** | ASSISTANT CLERK<br>X | SESSION PHONE# |
|---|---|---|---|

SCV020\ 11/2014